---

## In re CROSS.

(District Court, N. D. New York.    May 21, 1920.)

1. **Banks and banking ⬤134(1)—Bank entitled to apply deposit on demand note, but may waive such right.**

   Whether one indebted to a bank on a demand note was solvent or insolvent, the bank had a right to insist on a set-off of the debtor's deposit, and to retain the deposit and credit it on the note, there being no agreement to the contrary; but it could waive this right, recognize the debtor's ownership of the deposit, and allow him to retain it, check it out, or apply it as a payment on the note.

2. **Set-off and counterclaim ⬤1, 8(1)—Right of set-off existed in equity, but not at law, independent of statute.**

   The right of set-off in actions at law did not exist at common law, but was created by statute; but the equitable remedy of set-off existed at common law, independent of statute.

3. **Set-off and counterclaim ⬤3—Statutes respecting "counterclaims" held to include recoupment and set-off.**

   The provisions of the New York Court of Civil Procedure on the subject of "counterclaims" include recoupment and set-off.

   [Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Counterclaim.]

4. **Bankruptcy ⬤188(3)—Bank held to lose lien on assigned accounts after collection and deposit of proceeds by assignor.**

   Where one indebted to a bank assigned accounts receivable to it, under an agreement that he might collect the accounts and deposit the proceeds in such bank, with the right to check against it as required in the conduct of the business, and that he would make daily assignments of all new accounts receivable in place of those so collected, when money collected was deposited in the debtor's name, subject to his check, and new accounts were substituted, the bank lost all lien and claim on such money by virtue of the agreement to assign as against other creditors and the debtor's trustee in bankruptcy.

5. **Bankruptcy ⬤165(1)—Bank held to have received payment from bankrupt and not exercised right of set-off.**

   Where a bank, holding its depositor's demand note, on discovering that his financial condition was unsatisfactory, demanded a check for the amount of the deposit, and, on receiving it, canceled the note and took a new note for the amount due, less the deposit, the transaction *held* a pay-

---

⬤For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes
265 F.—49

ment to the bank, and a voidable preference, and not an exercise of the bank's right of set-off.

**6. Bills and notes** ☞405—**Demand note held to have become due and payable by demand.**

Where a bank, holding its depositor's demand note, demanded that he give it a check for the amount of his deposit, canceled the note, and took a new note for the amount of the old note, less the deposit, what was done operated as a demand, making the old note due and payable.

**7. Bankruptcy** ☞166(1)—**Bank entitled to enforce right of set-off, and right not affected by payment by check.**

If one indebted to a bank on a note makes deposits in the due course of business, without intent to give it an opportunity to secure a preference, and the note is due, the bank has a banker's lien on the deposit, and may enforce it by set-off, though it knows the depositor is insolvent and contemplates bankruptcy proceedings, and the set-off may be made before or after such proceedings are instituted, and the fact that it takes the form of a payment by check drawn against the deposit is immaterial.

**8. Banks and banking** ☞134(4)—**Under agreement with debtor, bank not entitled to appropriate deposit to payment of debt due it.**

Where one indebted to a bank on a demand note assigned accounts as security, under an agreement that he might collect them, deposit the proceeds, and check against the deposit as required in the conduct of the business, and that he would make daily assignments of all new accounts in place of those so collected, the bank was bound by the agreement that the debtor might check against the deposit for the payment of debts and obligations incurred in the business, and it had no right as against such creditors to appropriate the deposits to the payment or extinguishment of its pre-existing debt.

In Bankruptcy. In the Matter of John M. Cross, bankrupt. On review of report and decision of a special master. Order in favor of the trustee.

See, also, 244 Fed. 844.

Review of that part of report and decision of Hon. Chas. L. Stone, special master, holding in substance that the City Bank of Syracuse, N. Y., received a voidable and recoverable preference, knowing of the insolvency of the bankrupt, on the 23d day of October, 1916, and on the same day the petition in bankruptcy was filed, by means of a check of the bankrupt, drawn on his bank account for the sum of $2,755.24, and applied as a payment on a note of the bankrupt for $18,000 held by the bank; and also that part holding that the bank received a voidable and recoverable preference, by taking and withholding and applying on the same note October 25, 1916, the sum of $621.61, the balance received by the bank for 205½ barrels of flour, for which the bank had taken a warehouse receipt issued to Cross as collateral to a note of the now bankrupt for $1,261.39, after paying such note of $1,261.39 from the proceeds of the sale of the flour. The validity of an assignment of the accounts of Cross to the said city bank to secure the payment of such note of $18,000 was in question before the special master, but under recent decisions the trustee does not press that claim.

Costello, Burden, Cooney & Walters, of Syracuse, N. Y., for trustee.
Chapman, Newell & Crane, of Syracuse, N. Y., for City Bank.

RAY, District Judge (after stating the facts as above). At the times mentioned the City Bank was a banking institution or company of the city of Syracuse, doing business as such. Prior to April 15, 1916, the now bankrupt and one Ahlheim became copartners in trade in

the city of Syracuse, and borrowed from the said bank the sum of $18,000, said indebtedness being represented by the promissory note of such firm, and as security for its payment the firm assigned to the bank all their accounts receivable. It was agreed between the bank and such copartnership that the latter in the course of its business might collect the assigned accounts, or any part thereof, the amounts so collected to be deposited in the said City Bank to the credit of the said firm, with the right to check out of and against such account such portion thereof as should be required by the copartnership in the conduct of its business. The copartnership was to make daily assignments of all its new accounts receivable in place of those thus collected, so as to keep such security for such note unimpaired. This agreement was executed and carried out by and between the bank and said corporation down to April, 1916, when the partnership was dissolved, and thereafter Mr. Cross, the now bankrupt, continued the business in his own name individually. He so continued the business under a renewal of the same agreement between himself and the bank. It was also a part of the original and of such renewed agreement that each month a representative of the bank should examine the books of the firm during its continuance and of Mr. Cross after the dissolution. This was done from the making of the agreement originally down to the day of the filing of the petition in bankruptcy in this matter against Cross on the 25th day of October, 1916. Cross was adjudicated a bankrupt November 14, 1916, and Frank B. Hodges was duly appointed and qualified as trustee December 26, 1916. The said note of $18,000, assumed and renewed by Cross, remained at its original amount, and when the petition in bankruptcy was filed, as stated, the bank held the assignment of accounts under such agreement aggregating about $24,000. On that day, in the morning, Mr. Cross had on deposit to his credit in said bank the sum of $2,755.24. So far as appears, this credit arose from deposits made in running the business.

About one week prior to the filing of such petition in bankruptcy the bank caused a thorough examination to be made of the book accounts, assets, and liabilities of said Cross, and the result of this examination was reported to the bank. After the receipt of this report the bank sent a notice to each debtor of Cross that it, and not Cross, was the owner of all such accounts owing to Cross, but for such assignment, and that same should be paid to it, and not to Cross, and so far as paid same were thereafter paid to the bank, and since the petition was filed the bank has collected and received on such assigned accounts the sum of $13,555.63. At that time Mr. Cross was actually insolvent, and the bank had notice and knowledge of the fact. Cross had a stock in trade valued at $15,025.57, and was owing various creditors on unsecured claims $35,015.86. The special master finds, and the evidence shows, that the accounts originally assigned to the bank were substantially all replaced by new accounts substituted by assignment of same under the agreement and by daily assignments.

On the day the petition in bankruptcy was filed against Cross, October 25, 1916, the officers of the bank called Cross into the bank and informed him in substance that matters could not go on longer,

and Cross stated he could see no way but to go into bankruptcy. The officers of the bank then requested Cross to give it a check on his account with the bank for the balance to his credit, $2,755.24, to apply on the note of $18,000, for the payment of which it held such security by way of said assigned accounts, and Cross did give to the bank, payable to its order, a check for such balance, $2,755.24, dated that day, and that sum was charged to the account of Cross and credited on the amount due on the note, and a new note for the balance was given by Cross, and entries accordingly made on the books of the bank. The old note was surrendered. According to the statement under oath of Mr. Cross there was no suggestion that this was to be or was regarded as an exercise of the right of set-off, or that the check was asked or given as a step in making and effecting a set-off of the amount due Cross and to his credit in the bank against the amount due the bank on the note of $18,000, for which it held the security as stated. The bank claims, however, that before Cross was called in and requested to give the check, and before it was given, it had instructed the bookkeeper to charge the account of Cross $2,755.24, the balance to his credit, and credit that amount on the note, which was a demand note, and that such charge had been made and credit given, and that thus the right of set-off had been actually exercised before the check was given. The bank claims that it desired the check as a voucher, and for that reason requested Cross to give it, and for that purpose received it, and that the check was not given as a payment, or requested, received and accepted as such, and that the new note was requested and given to evidence the balance due after the set-off was effected by mutual consent.

The transaction, according to the statement of Cross, and fully corroborated by the check and note, has all the "earmarks" of a payment, and none of those of a set-off. If the note was due, the bank, but for the special agreement, had the undoubted right of set-off, and the right to exercise it. It was not under any obligation to exercise such right. It had the undoubted right to demand payment of the note, as it was a demand note, and payment had not been demanded or requested, and to accept and receive payment in whole or in part, and ask and accept a new note for the balance. Cross describes what transpired as follows:

"Q. On October 25, 1916, did you have a talk with Mr. Ellis and Mr. Chapman in reference to your business matters? A. I did.

"Q. Where was that conversation? Where did it take place? A. I talked with Ellis first at the City Bank, and we adjourned to what I now recall as Mr. Chapman's office in this building, Onondaga County Savings Bank Building, which was right near the City Bank, and Mr. Chapman was called in, or met there by appointment, by Mr. Ellis.

"Q. How did you happen to go over and see Mr. Ellis that morning? A. He telephoned for me to come over.

"Q. What talk did you have with Mr. Ellis that morning, before you came up to Mr. Chapman's office? A. I don't recall a word that was said until we came upstairs.

"Q. What took place after you got to Chapman's office? A. Reference to the letter was made by myself.

"Q. What did you say, as near as you can recollect? A. I was asked what I proposed to do, and I replied that on account of the letter there was nothing

left for me to do but go into bankruptcy, or be forced into bankruptcy. Then the matter of signing this check, which they wanted me to sign, was brought up.

"Q. What was said about that? A. Mr. Ellis, as I recall, said that there was a balance in the bank which they wanted to convert to the note, or apply on the note, or to my account, as he called it, and I believe he sent for Sanford to figure out the exact amount, giving credit for this flour, and had the check made out for me to sign, requested me to sign it, and I did sign it.

"Q. That check was for about $2,700? A. As I remember it, $2,700 and some dollars.

"Do you recollect any other talk you had there that day? A. I remember asking if the outstanding checks would be honored, and they told me that they would not be; that they would be sent back."

The special master has found as to that transaction as follows:

"The transaction occurred on the day when the petition was filed. Whether before the filing or after does not appear. The transaction bears the earmarks of a payment. The check was given, and thereupon the amount thereof was applied upon the old note, which was then surrendered, and a new note taken for the balance. While the situation afforded the bank an opportunity, later and in ordinary course, to retain this balance as an offset upon adjusting its claim against the bankruptcy estate, I conclude that what it did do was to accept Mr. Cross' check as a payment, and that the payment having been made with knowledge of both parties of the insolvency of the drawer, and upon the day of the filing of the petition, that the trustee may recover the same as preferential. * * *

"(6) On the morning of the 25th of October, the date of the filing of the petition, the general deposit account of said John M. Cross in said bank above referred to showed a balance in his favor of $2,755.24. On that day, upon the request of officers of said bank, John M. Cross executed and delivered to the bank a check for the amount of the balance to his credit in said account and delivered to the bank a new note, payable on demand, for the difference between the amount due upon the original note of $18,000 and the amount of his check, namely, $15,226.76, and received in exchange the original note for $18,-000, surrendered to him by the bank."

[1] The bank, whether Cross was solvent or insolvent, had the right to insist on a set-off, and whether Cross assented or dissented, if the note was not paid, to retain the amount of the deposit to the credit of Cross and credit it on the amount due on the note, there being no agreement to the contrary. But the bank had the undoubted right to waive this right of set-off, recognize the ownership of Cross as to the amount on deposit, and allow him to retain it, check it out for any purpose, or apply it as a payment on the note. The amount of the deposit due from the bank to Cross was by means of the check applied on the note due from Cross to the bank. In so applying it, both had the insolvency in mind, and were acting in view of and in anticipation of the bankruptcy of Cross and bankruptcy proceedings.

Assuming that the amount due Cross was transferred to the bank as a payment on the note under such circumstances, was it the giving of a preference which may be recovered by the trustee in bankruptcy for the benefit of general creditors? This is a case of conceded insolvency, existing and known to both parties at the time the check was given, and the money transferred by means thereof and applied on the note. On the one hand, we have the equities of the bank; and on the other hand, the equities of the general creditors. The result of

what was done was to transfer the balance in bank to the credit of Cross to the bank in reduction of its claim on the note, whether it was done by way of payment or by way of the exercise of the right of set-off. If nothing had been done on the filing of the petition in bankruptcy, and an adjustment of the claim of the bank, assuming the security was not sufficient to pay the note, the set-off would have been made by the bankruptcy court. Equity demanded that the set-off be made, but of course the bank had the right to waive its right to have this done. If the right was actually waived, I do not see that it can be revived, for the reason the payment made constituted a preference under the Bankruptcy Act.

[2] The right of set-off in actions at law did not exist at common law in England, but was created by statute, and most, if not all, of the states of the United States have created this right by statute. The equitable remedy of set-off existed, however, at common law, independent of any statute. See 34 Cyc. 626, 633, where it is said, citing cases:

"A set-off exists only by virtue of statute, and was unknown at common law, according to which mutual debts were distinct and inextinguishable, except by actual payment or release, and a defendant who had a demand against plaintiff was compelled to resort either to his cross-action or a bill in chancery; but the right of recoupment, being formerly so very limited, gave rise to the necessity of the enactment by statute of the remedy of set-off, which was designed by allowing set-offs in actions at law to supersede bills in equity for that purpose, and which was derived from the compensation of the civil law, and the two systems are analogous in many particulars. * * *

"The power to compel a set-off of debts was exercised by courts of equity prior to any statute on the subject, and exists independent of those statutes, being allowed upon the general principles of equity and upon the equitable jurisdiction of the court over its suitors, and statutes allowing set-offs have not taken away the equitable jurisdiction, but have merely provided a remedy at law for the set-off of mutual claims between parties, which might always have been done in equity, and were passed mainly to obviate the necessity of a resort to equity in every case of mutual independent claims upon both sides."

[3] In New York the provisions of the Code of Civil Procedure on the subject of counterclaims include recoupment and set-off (Goodman v. Rutchik [Sup.] 171 N. Y. Supp. 152), and the right may be waived (Bailey v. Fear, 182 App. Div. 331, 169 N. Y. Supp. 581). In Scott v. Armstrong, 146 U. S. at page 510, 13 Sup. Ct. 151, 36 L. Ed. 1059, decided in 1892, the Supreme Court of the United States said:

"Where a set-off is otherwise valid, it is not perceived how its allowance can be considered a preference, and it is clear that it is only the balance, if any, after the set-off is deducted, which can justly be held to form part of the assets of the insolvent."

In that case the court was applying the ordinary equity rule of set-off, and held:

"The ordinary equity rule of set-off in case of insolvency is that, where the mutual obligations have grown out of the same transaction, insolvency, on the one hand, justifies the set-off of the debt due, on the other; and there is nothing in the statutes relating to national banks which prevents the application of that rule to the receiver of an insolvent national bank under circumstances like those in this case."

In the opinion the court further said:

"The requirement as to ratable dividends is to make them from what belongs to the bank, and that which at the time of the insolvency belongs of right to the debtor does not belong to the bank. There is nothing new in this view of ratable distribution. As pointed out by counsel, the Bankruptcy Act of 13 Eliz. c. 7, contained no provision in any way directing a set-off or the striking of a balance, and by its second section commissioners in bankruptcy were to seize and appraise the lands, goods, money, and chattels of the bankrupt, to sell the lands and chattels, 'or otherwise to order the same for true satisfaction and payment of the said creditors, that is to say, to every of the said creditors a portion, rate and rate alike, according to the quantity of his or their debts.' 4 Statutes of the Realm, part 1, p. 539. Yet, in the earliest reported decisions upon set-off, it was allowed under this statute. Anonymous, 1 Mod. 215; Curson v. African Co., 1 Vern. 121; Chapman v. Derby, 2 Vern. 117. The succeeding statutes were but in recognition, in bankruptcy and otherwise, of the practice in chancery in the settlement of estates, and it may be said that in the distribution of the assets of insolvents under voluntary or statutory trusts for creditors the set-off of debts due has been universally conceded. The equity of equality among creditors is either found inapplicable to such set-offs or yields to their superior equity."

Section 68 of the Bankruptcy Act of 1898 provides as follows:

"a. In all cases of mutual debts or mutual credits between the estate of a bankrupt and a creditor the account shall be stated and one debt shall be set off against the other, and the balance only shall be allowed or paid.

"b. A set-off or counterclaim shall not be allowed in favor of any debtor of the bankrupt which (1) is not provable against the estate: or (2) was purchased by or transferred to him after the filing of the petition, or within four months before such filing, with a view to such use and with knowledge or notice that such bankrupt was insolvent, or had committed an act of bankruptcy." Comp. St. § 9652.

In Studley, as trustee, etc., v. Boylston, 229 U. S. 523, 33 Sup. Ct. 806, 57 L. Ed. 1313, it is held that this provision of the Bankruptcy Act did not create the right of set-off, but recognizes its existence and provides a method for its enforcement, even after bankruptcy. In that case it was found that the deposits in bank and payment of notes therefrom were not made to enable the bank to secure a preference by the exercise of the right of set-off, but in due course of business. In the instant case there was an agreement by which, while the now bankrupt could collect the assigned accounts and deposit the proceeds to his credit, and draw and use same in the conduct of his business, on assigning other and new accounts to take their place, which was done, still there was a limitation on the use of such deposits, but nothing which interfered with the right of Cross to check out the fund, or any part, and use the money to pay his debts incurred in the running of the business, or the note in question, which represented loans used by Cross in conducting such business.

[4] In the instant case it is evident that the purpose of the bank from the beginning was to keep all accounts due the now bankrupt within its reach at all times, together with the proceeds of collections, so far as consistent with Cross doing business at all in his own name. This was a secret arrangement between Cross and the bank, and in effect gave to the bank an advantage over all other creditors of Cross,

and a preference, although, perhaps, not a recoverable preference, as defined by the Bankruptcy Act. When the money derived from the collection of assigned accounts went into the bank in the name of Cross, subject to his check, and new accounts were substituted by assignment, I think the bank lost all lien and claim thereon by virtue of the agreement to assign accounts as against other creditors, and as against the trustee in bankruptcy representing them; but this fact does not affect the right of offset.

[5] I think the special master was right in holding that what the parties did on the 25th day of October, 1916, was intended by them to be, and constituted, a payment by Cross from his funds on deposit in the bank to the bank, and not an exercise of the right of set-off, and that it was not the purpose or intent of the officers of the bank at the time to exercise any right of set-off, but to demand or request that Cross make a payment on the note by checking the amount on deposit to his credit over to the bank, and that the bank at the time accepted and received it, and applied the check as a payment on the indebtedness of $18,000 represented by the note, and surrendered such note, taking a new note for the balance. The bank in the transaction was represented by able counsel, Mr. Chapman, and must have known that, in order to effect the exercise of the right of set-off, neither the presence nor the consent of Mr. Cross nor the giving of a check was necessary. In fact, the giving and acceptance of a check was inconsistent with the exercise of the right of set-off, as was the surrender of the old note of $18,000 and the giving of the new note for the balance, $15,226.76, with a pledge of collateral the same as before. The new note reads as follows:

"$15,226.76.                                    Syracuse, N. Y., Oct. 25, 1916.

"On demand after date I promise to pay to the order of myself fifteen thousand two hundred twenty-six 76/100 Dollars, for value received, payable at the City Bank of Syracuse, with interest.

"I have deposited or pledged as collateral security for the payment of this note:

| Corporation. | Issue. | Numbers. |
| --- | --- | --- |

"Assignments of accounts as per lists already in hands of City Bank of Syracuse.

"The margin of collaterals hereunder shall always be kept good as at present, and at not less than 25 per cent., and in default thereof, this note shall immediately become and be payable on demand, and I hereby give to the holder hereof full power and authority to sell or collect at my expense all or any portion thereof, at any place, either in Syracuse, New York, or elsewhere, at public or private sale, or otherwise at holder's option, on the nonperformance of the above promise, and at any time thereafter, without advertising the same or otherwise giving me any notice. In case of sale thereof, public or private, the holder may purchase without being liable to account for more than the net proceeds of such sale, and any surplus arising in any manner from said collateral may be applied on any other indebtedness now or hereafter owing by me to said bank for which I am or may be liable in this manner.

"[Signed]   John M. Cross."

The check given by Cross reads as follows:

"The City Bank 50—43.

" 'Of the People—By the People—For the People.'

[Picture      "Syracuse, New York, Oct. 25th, 1916.

The    "Pay to the order of City Bank \$2,755.24, twenty-seven hundred
City    fifty-five and 24/100 dollars, proceeds of collections from assigned
Bank.]   accounts.

"East Genesee Street

    "Between

"Salina and Warren Streets. No. ———.       John N. Cross."

If a voucher was desired to show that the right of set-off had been exercised, an appropriate paper reciting the fact would have been drawn, executed, and delivered. I search the evidence in vain for any reference by either party during the transaction to the exercise of the right of set-off or the existence of such right. In the absence of all reference to set-off, it seems to me the special master was right in determining that what the parties actually said and did determine what their purpose and intent was. As is said in In re National Lumber Co. (People's Bank, etc., v. Fell) 212 Fed. 928, 129 C. C. A. 448:

"The parties chose to pay and to accept the money in the ordinary course of events, and their conduct is to be judged by what they did, not by what they might have done. Bank v. Campbell, 81 U. S. (14 Wall.) 87, 20 L. Ed. 832."

In the case just cited the facts show that the depositor gave a note of \$3,000 to the bank, and that the bank later, and before maturity of the note, learned that the maker was insolvent. The depositor began to accumulate deposits in the bank, discounting some customer's notes for the purpose, refusing to have other notes, when due, charged to its account, as had been its custom, and when the deposits equaled its note a check was drawn on the bank, and given to and accepted by it in payment of the note, which was surrendered before its maturity. The Circuit Court of Appeals, Third Circuit, held this was not a set-off, but a payment, and a recoverable preference. The court said:

"Clearly every element of a preference is here. The only defense is that section 68a applies and relieves the bank:

" 'a. In all cases of mutual debts or mutual credits between the estate of a bankrupt and a creditor the account shall be stated and one debt shall be set off against the other, and the balance only shall be allowed or paid.'

"The general meaning of this clause is plain enough, and we need hardly refer to the discussion in Bank v. Massey, 192 U. S. 138, 24 Sup. Ct. 199, 48 L. Ed. 380, cited in Bank v. Chicago, etc., Co., 229 U. S. 435, 33 Sup. Ct. 829, 57 L. Ed. 1268. The difficulty is that the decision does not fit the facts of the present case. If the company had allowed the money to remain in its account until after bankruptcy had supervened, a situation would have been presented to which the clause might have applied. But this was not done. The money was actually drawn out by the company—for this was the effect of its check—and was actually handed over to the bank in payment of the note, so that we do not have a case of mutual accounts where one may be set off against the other, but the case of the use of money to pay a debt under circumstances that made the payment preferential. The argument really comes to this: If the payment had not been made, the bank could have set off the deposit against the note, and the result would then have been just what it is now. The sufficient

answer is—the contingency did not happen. The parties chose to pay and to accept the money in the ordinary course of events, and their conduct is to be judged by what they did, not by what they might have done. Bank v. Campbell, 81 U. S. (14 Wall.) 87, 20 L. Ed. 832.

In the instant case we have a demand note, not one paid before maturity.

In Traders' Bank v. Campbell, 81 U. S. (14 Wall.) 87, 97 (20 L. Ed. 832), as to one of the matters involved the court said:

"There was in the bank on deposit to the credit of Hitchcock & Endicott on the day they gave the judgment note, the sum of $325.20. This sum was not computed or deducted when the note was given. On the next day, before the bank caused the judgment to be entered up, they credited this amount on the note, and took judgment for that much less. They now assert that this was what they had a right to do, and that it should remain a valid set-off. But this does not appear to have been really what was done. It appears that Hitchcock & Endicott gave the bank a check for the sum, and by virtue of that check it was indorsed on the note as a payment. Now as both the bank and the bankrupts knew of the insolvency of the latter, this was a payment by way of preference and therefore void by the thirty-fifth section of the Bankrupt Act. In this case as in the other, if they had stood on their right of set-off, it might possibly have been available, but when they treat it as the bankrupts' property, and endeavor to secure an illegal preference by getting the bankrupts to make a payment in the one case, and seizing it by execution in the other, when they knew of the insolvency, both appropriations are void."

I discover no material difference between that case and the one at bar.

True, the amount of the check was indorsed on the note held by the bank "as a payment," says the opinion; but in the instant case the amount of the check, while not indorsed on the old note of $18,-000 as a payment, was applied on the debt represented by such note in part payment, and a new note given for the balance; the old note being surrendered. True, no money was handled or actually passed from hand to hand, but a check representing so much money was executed by Cross and passed to the bank, which then credited the amount represented by the check on the debt represented by the note and the account of Cross was charged the amount of such check.

This court, on the authority of Traders' Bank v. Campbell, supra, would have no hesitation in sustaining the report and decision of the special master, and holding the transactions here a payment and recoverable preference and not a set-off, but for the later decision of the Supreme Court in Studley v. Boylston Bank, 229 U. S. 523, 527, 529, 33 Sup. Ct. 806, 57 L. Ed. 1313. In that case the facts were: (1) The Collver Company owed the bank $25,000, represented by five notes, of $5,000 each, maturing September 12, 20, and 30, and October 3 and 14. The balance of Collver Company in the bank fluctuated from almost nothing to $54,000. Large sums were deposited in August and September, and smaller sums in October and November. (2) During that period $22,500 was paid to the bank; the three notes maturing September 12, 20, and 30, being paid by checks on the deposit in the bank. The note due October 3 was charged to the company's account, and on the same day a renewal note of $2,500 was discounted. The note which fell due October 14 was also charged to

the account, according to custom of which the company had notice, and to which it gave its assent. December 16, following, a petition in bankruptcy was filed against the Collver Company, and the trustee sued the bank to recover the $22,500, on the ground the bank, at the time of the said payments by check and charges to the account of the company, had notice of the company's insolvency, and that such payments were transfers constituting preferences. (3) In its answer the bank alleged that the company was, during the times mentioned, constantly making deposits in the bank, and that upon all of such deposits the bank had a lien and a right of set-off, and that the right of set-off was not affected by the fact, if a fact, that the company was at the time of the exercise of such right of set-off insolvent. The bank also claimed that the exercise of the right of set-off did not and could not constitute a preference within the meaning of the Bankruptcy Act. (4) The referee held that such payments were not transfers, or, if such, the trustee could not recover, inasmuch as the bank had no reasonable cause to believe that the payment of such notes would operate as a preference.

The District Court held that the deposits had been made honestly and in due course of business, and that the bank, by virtue of its banker's lien and right of set-off, could retain the money. This holding was affirmed by the Circuit Court of Appeals. 200 Fed. 249, 118 C. C. A. 435. The trustee then took the case to the Supreme Court, claiming that, if the charges by the bank to the account of the company were not transfers, but the exercise of the right of set-off, the giving and acceptance of the three checks in payment of three of the notes certainly were, and that the bank necessarily knew it was receiving a preference. This claim was insisted on, notwithstanding the unreversed finding that the bank had no reasonable cause to believe that the payment of the notes would operate as a preference. The Supreme Court on this subject said, as to payment by the checks:

"But if, as found by the referee, the bank had no reasonable cause to believe such transfers would effect a preference, the payments by checks for $15,000 drawn on the deposit account are as much protected as if on the same dates similar checks had been given in payment of like amounts due another bank, with which the Collver Company kept no account. For there is nothing in the statute which deprives a bank, with whom an insolvent is doing business, of the rights of any other creditor taking money without reasonable cause to believe that a preference will result from the payment. The Bankruptcy Act contemplates that by remaining in business and at work an insolvent may become able to pay off his debts. It does not prevent him from continuing in trade, depositing money in bank, drawing checks, and paying debts as they mature, either to his own bank or any other creditor. It does provide, however, that if bankruptcy ensues all payments thus made, within the four months period, may be recovered by the trustee, if the creditor had reasonable cause to believe that a preference would be thereby effected."

This, of course, effectually disposed of the contention of the trustee that he could recover the payments made by check, if payments and transfers of property, within the meaning of the Bankruptcy Act; that is, of any claim to recover same as a mere preference. The unreversed finding was that the bank did not have reasonable cause to

believe that a preference would be effected by the receipt of such payments by check. The court then goes on to say:

"We find nothing in the record to indicate that the deposits were made for the purpose of enabling the bank to secure a preference by the exercise of the right of set-off."

The court then went on to discuss the nature of the right of set-off and then summarizes as follows:

"The bank was indebted to the Collver Company as a depositor some $54,000 for money deposited in good faith in the usual course of business and with no purpose of enabling the bank to secure the right of set-off. The Collver Company, on the other hand, was indebted to the bank $25,000 on notes maturing at various dates. These were mutual debts, and if, on the date the first note became due, the Collver Company had failed to pay it, the bank could have enforced its banker's lien on its right of set-off, by applying $5,000 of the deposits in payment of the note which matured that day, and so on as each of the other notes became due. It cannot have been illegal for the parties on September 12, 20, and 30, and on October 3 and 14, to do what the law would have required the trustee to do in stating the account after the petition was filed on December 16, 1910. No money passed in either instance; for whether the checks for $5,000 were paid or notes for $5,000 were charged was, in either event, a book entry equivalent to the voluntary exercise by the parties of the right of set-off."

It has not been found by the special master, and I do not see how it could be found, on the evidence in this case, that the deposits in the City Bank were made by the now bankrupt or received by the bank with any view or purpose of enabling the bank to secure or exercise the right of set-off. Hence, under the decision in the Studley Case, quoted from, it could not have been illegal (that is, the creation or payment of an illegal or recoverable preference) for the parties on the day the petition in bankruptcy was filed to voluntarily do what the law would have required the trustee to do after the petition was filed. Under the ruling of the Supreme Court it is not enough that the application of the smaller debt owing by the bank to Cross was applied, by means of a check drawn by him and payable to the bank, and by it charged to the account of Cross, to the extinguishment so far as it would go of the larger debt of $18,000 owing by Cross to the bank. Even if we regard it as a payment, it was a payment to the bank of a fund deposited in the bank subject to check, to which such bank was entitled, if not checked out to others, and on which it had what the opinion in the Studley Case calls a "banker's lien."

[6] If the bank had such a lien, and requested and obtained the check against the account for the money, and applied it on the debt owing by Cross to the bank, it was simply a reduction to absolute control of that in its possession to which it had a legal and an equitable right for the purpose of set-off. I cannot see that it can properly be held that the bank waived its banker's lien when it requested and obtained a check for that of which it had possession, and on which it had such lien, and then applied it in reduction of the demand note held by it. The effect of the transaction was to apply the amount of the deposits remaining to the credit of Cross where the law and equity would have applied it after the filing of the petition, if nothing

had been done. While the checking over of the amount of the deposit was not mentioned as an exercise of the right of set-off, the acts done did operate as a practical set-off of the deposit owing by the bank to Cross against and in reduction of the note due on demand from Cross to the bank. I think what was done that day operated as a demand, and that the note had become due and payable when the check was given.

It cannot be doubted that in the instant case the bank knew, when it requested or demanded the check·from Cross, that the receipt and credit on the note of the amount represented by it then on deposit would reduce the estate of Cross by that amount, and that the bank also knew that the receipt of the check and credit on the note of the amount represented thereby would operate as a preference, when considered as a payment by a debtor to a creditor only; both having knowledge of the insolvency. The bank had just completed an examination of the books of Cross and was aware of his insolvency; that is, that his property at a fair valuation would not pay his debts. The giving of the check and its application on the note operated to pay so much on the note and reduce the indebtedness of Cross to the bank by that amount, and so pay that amount in full. But the decision in Studley, as Trustee, etc., v. Boylston Bank, supra, holds that a bank has a banker's lien on its customers' deposits in such bank, and under it the right to set off or apply the amount of such deposit, so far as necessary, against such due indebtedness as the customer owes the bank. If a bank, on discovering the insolvency of its customer and his inability to pay his creditors in full, loses its lien and this right of set-off—that is, its right to enforce its banker's lien—then it can be held that requesting the customer to turn over the deposit and receiving it by means of a check and applying it on the debt of the customer to the bank constitutes a preferential payment under the Bankruptcy Law, but not otherwise.

[7] As I understand the Studley Case, it is intended to hold, and does hold, that if a bank holds the note of one of its customers, and the customer makes deposits in due course of business from time to time and without intent to give the bank an opportunity to secure a preference by exercising the right of set-off, and has a balance to his credit due from the bank, and the note falls due and is not otherwise paid, the bank has this banker's lien on the deposit, and may enforce it by set-off, even if it has at the time full and complete knowledge of the insolvency of such customer, and that the customer contemplates bankruptcy proceedings, and that such set-off may be made before such bankruptcy proceedings are instituted, or thereafter, and that the fact that the set-off or enforcement of the lien takes the form of a payment by check drawn against the account is immaterial. If, however, such deposit in the bank is built up by the customer to the knowledge of the bank for the purpose of allowing the bank to exercise this right of set-off, then the payment by check on the account would constitute a preferential payment, denounced by the Bankruptcy Act.

If such deposits are made for the purpose described and received with that understanding, we have a case where the money of the

bankrupt is placed within the reach and power of the bank, to be applied on its claim to the exclusion of other creditors, and, assuming reasonable cause to believe the existence of insolvency, would constitute a transfer of property and a preferential payment, whether a check was given or not. Hence, guided by and following the Studley Case, while the transaction of asking and receiving the check and applying it on the note of $18,000, and taking a new note for the balance, has the earmarks of a payment, and not of a set-off, still, considering the relation and rights of the parties, it would seem that the right of set-off, if it existed, was not waived, but that a practical set-off, permissible and justifiable under the law as settled in the Studley Case, was in fact made by the parties. The money was checked over, to be applied on the note due the bank, and was so applied, and not for any other purpose.

Studley, Trustee, etc., v. Boylstan Nat. Bank, 229 U. S. 523, 33 Sup. Ct. 806, 57 L. Ed. 1313, holds that the Bankruptcy Act did not create the right of set-off, but recognizes its existence and provides a method for its enforcement even after bankruptcy. In that case it was found that the deposits and payment of notes were not made to enable the bank to secure a preference by the exercise of the right of set-off, but in due course of business. N. Y. Co. Nat. Bank v. Massey, 192 U. S. 138, 24 Sup. Ct. 199, 48 L. Ed. 380.

[8] But the relation between the City Bank and Cross was not that of the ordinary depositor and borrower, from a bank with such bank. In such a case each becomes the debtor and also the creditor of the other, and the right of set-off seems to attach as matter of law. Here in the first instance the accounts due Cross were assigned to the bank as collateral security for the payment of the note, but it was a part of the agreement that Cross should collect such accounts and deposit the proceeds of such collections in the bank, with the right to draw on and against such deposits for the payment of his debts and obligations incurred in continuing and running his business. This agreement the bank was under obligation to recognize and perform. It had no right as against such creditors to appropriate such deposits, when made, to the payment or extinguishment of a pre-existing debt owing by Cross to the bank. I am of the opinion that the relations between the bank and Cross under their agreement were such that as to the amount on deposit in the bank derived from assigned accounts the right of set-off against pre-existing debts owing by Cross to the bank did not exist in favor of the bank.

The special master has found in substance, and I think the finding justified and required, that the transaction, at the time the check was given between Cross and the bank, constituted and amounted to a payment on the note, and thus in substance is a finding that the giving and acceptance of the check was not the exercise of the right of set-off. Considering the two cases referred to, decided by the Supreme Court of the United States, in connection with all the facts of this case, I have reached the conclusion that the giving of the check by Cross to the bank, and the application thereof on the note as a payment, and the giving of a new note for the balance, constituted

a payment and the giving of a preference, voidable under the Bankruptcy Law.

As to the $621.61, the balance received by the bank for the flour, I am unable to find any justification for the retention of same and the application thereof on the old note for $18,000. There was no agreement, express or implied, which would authorize such retention and application of that balance on the note.

There will be an appropriate order accordingly.